<hr />

### GWALTNEY v. INSURANCE CO.

(Filed April 5, 1904).

For former opinion in this case and headnotes thereto, see *Gwaltney v. Assurance Society*, 132 N. C., 925.

Petition to rehear this case dismissed.

MONTGOMERY and WALKER, JJ., dissenting

*Maxwell & Kearns,* for the petitioner.
*T. B. Hufham* and *E. B. Cline,* in opposition

CLARK, C. J.  This is a petition to rehear the former decision in this case, 132 N. C., 925.  The same propositions of law, as now, were presented and argued on the former hearing.  No material point of law or fact has been shown to have been overlooked, and our opinion would be simply a reiteration, substantially, of what was written on the former hearing.  Whatever difference of view there may be as to the facts, the jury, in their province, have determined the truth or falsity of the averments on both sides, and we cannot disturb their finding.  The case had been previously before this Court, 130 N. C., 629, and has been heretofore fully considered.  It is now ordered

Petition dismissed.

MONTGOMERY, J., dissenting.  The defendant company cancelled the plaintiff's policy of insurance because of a re-

fusal on the part of the plaintiff to pay premiums which the defendant averred that the plaintiff owed, and this action was brought to recover the amount paid by the plaintiff as premiums before the cancellation of the policy. The complaint embraces two causes of action utterly antagonistic to each other, and in my opinion cannot be properly joined in the same action. The gravamen of the first cause of action is that the defendants through one of their general agents, by means of false representations, induced the plaintiff to accept a policy of insurance unlike the one which the defendant through its agent verbally agreed to issue and deliver to him.

The particulars of the first cause of action appear substantially in the following allegations: That the plaintiff told the agent that he desired a policy, and would accept none other, based upon a level premium from year to year and which would not increase with advancing age; that the agent promised to deliver to the plaintiff such a policy, and that upon that representation the plaintiff made application in writing for the policy; that shortly thereafter the agent delivered to the plaintiff a policy in accordance with the application, which did not provide for the payment of a level rate premium until the death of the plaintiff but did provide for an increase in the rate of the premiums due on the policy with the yearly advance in the plaintiff's age; that the agent (in the language of the complaint) represented to the plaintiff and assured him that the policy so presented was such a policy as the plaintiff had, in his former conversation, stated that he, plaintiff, would accept, and that the policy so presented by him provided for the rate of a level rate premium, to-wit, "$22.40 per quarter, and that the insurance provided in said policy would be extended during the life of the plaintiff upon the payment of a regular premium of $22.41 per quarter." There was another allegation that

those representations were false and that the agent knew they were false. As bearing more particularly upon the alleged fraudulent intent of the agent, we quote the eighth and ninth allegations of the first cause of action: "8. That Jones, the general agent of defendant, made the said false, deceitful and fraudulent representation wickedly and fraudulently, scheming and contriving, designing and intending, as plaintiff believes and alleges, to prevent the plaintiff from examining the policy and investigating the terms thereof, he the said general agent well knowing that the plaintiff would refuse to accept the policy if he (plaintiff) should learn its terms, conditions, stipulations and provisions, and the plaintiff explicitly alleges that he would have refused finally and peremptorily to accept the policy if he (plaintiff) had known the terms, conditions, stipulations and provisions of the policy tendered him by Jones, the general agent as aforesaid. 9. That the plaintiff knowing said Jones to be the general agent of the defendant, being not at all familiar with the terms, conditions, stipulations, provisions or language of insurance policies, and being totally unskilled in interpreting the same, relied upon and believed the said wicked, false, deceitful and fraudulent representations of the said Jones, hereinbefore set forth, and was by the said wicked, false, deceitful and fraudulent representations misled, deceived and prevented from investigating the terms, conditions, stipulations and provisions of the said policy, and finding out for himself and by the aid of friends or counsel what said terms, conditions, stipulations and provisions really were, and in consequence thereof accepted the said policy."

The plaintiff further alleges that, believing for nine years these fraudulent representations, he paid during that time $22.41 per quarter, and that only at the beginning of the tenth year was any demand made for an increased premium; that for two years he paid the increased premium

but refused after that time to pay any further increase. The plaintiff has paid $1,030.84 as premiums to the defendant.

The second cause of action has its foundation in an allegation that the plaintiff took out the policy just as it read when delivered to him by the agent, that is, a policy providing for an increase in the rate of the premium due on the policy with the yearly advance in the plaintiff's age, but that before the second annual premium in quarterly equivalents became due, to-wit, in December, 1890, the defendant, through its general agent, verbally agreed to renew and extend said policy for the plaintiff during each successive year of his life upon the payment of a level annual premium in quarterly equivalents of $22.41 each, and to waive the conditions of said policy providing for an increase of the rate of premium for the actual age attained. The complaint was duly verified by the plaintiff.

A few words will be sufficient to dispose of the matters pertaining to the second cause of action. His Honor submitted this issue (7th) raised by the second cause of action in the complaint: "Did the defendant through its general agent some time after the execution and delivery of the policy waive the provisions in the policy permitting the increase of the premiums, and agree to continue the policy upon payment of $22.41 per quarter during the life of the plaintiff as alleged in the complaint?" Upon that issue his Honor told the jury that it was incumbent upon the plaintiff to go further and establish the affirmative of the same to their satisfaction by proof clear, strong and convincing. The jury responded to that issue under that instruction "Yes." I have examined carefully every word of the evidence bearing on that issue, and there is not a scintilla even to support it.

The allegation in the second cause of action is that the agent in December, 1890, waived the conditions of the policy providing for an increase of the rate of premium for the

actual age attained, and agreed that he (plaintiff) should pay $22.41 quarterly as a level rate until his death, instead of increased premiums as he advanced in age, as the policy provided. In his examination-in-chief he testified that "Jones came to Wake Forest in November, I think, and stayed several days and insured several parties. After he returned to Greensboro I had a conversation with a Mr. Powell, in consequence of which I told Jones that Mr. Powell told me that he had examined a policy like mine at my request, and he said there was some doubts as to its running level in all the premiums till my death. I told him that Mr. Powell said he was not satisfied, as he had not examined it carefully, and there might be a- rising premium in it. I said I told Powell that there was no possibility that there was a rising premium on it, for I had been assured there would be none. I said: 'Now, Mr. Jones, my people live to be very old; suppose I live beyond seventy-five is there any possibility of a rise in that premium?' He told me emphatically that I need give myself no uneasiness. I went back home thoroughly satisfied that it never would rise on me. Q. Did he say anything more that you recollect? A. I thoroughly impressed upon him the fact. I went away assured." On his cross-examination he was asked: "I believe you stated that you never examined this policy and never knew that it was not a level rate policy till 1898, when they made a demand on you?" A. "That is right." Q. "You allege here that heretofore in the second year you knew it was a level rate policy?" A. "Exactly as it was issued." Q. "But that this company, acting through its general agent, made a verbal agreement with you to extend this policy?" A. "I thought that was the policy." Q. "What you say in this complaint is correct is it not?" A. "It is, as I understand it." Q. "You have sworn to the complaint, have you not?" A. "Yes." Q. "Did you not say in your answer a while ago that

about November, 1890, you had a conversation with Jones and he said you need not be uneasy about your policy?" A. "Yes. In 1890 he came to where I was living, and in consequence of Powell's statement I went there again in January; he came in November to the college and went back before Christmas." Q. "Then the only conversation you had with Jones some time in the second year caused him, in reply to something you said, to say that you need not give yourself any uneasiness about the policy?" A. "Yes." Q. "So that if this allegation means that you knew what the policy was at the end of the second year it is a mistake, is it not?" A. "I did not come to that knowledge, I am sure, at the end of the second year, that it was not a level rate."

The defendant denied the allegations of fraud and averred that the plaintiff received a policy of the nature applied for, and in accordance with the application signed by the plaintiff; that all verbal understandings or negotiations entered into between the plaintiff and Jones during the consultation about the policy were merged in the written policy when it was issued by the company and delivered; that no attempt was made by the agent to prevent the plaintiff from reading the policy when it was delivered, and that the plaintiff should have read it, and if he had read it he would have understood from reading it that it did not provide for a level rate; that the plaintiff kept the policy for years without reading it; that he knew that the agent did not issue the policy but that the same was issued in New York, the home office of the company, and sent to the agent at Greensboro for delivery to the plaintiff; and that the agent had no power to change the terms of the policy, and that the plaintiff is estopped by his conduct from rescinding the contract and demanding a return of the fees. The defendant denied also that the agent Jones was a general agent of the defendant.

It is to be seen from a reading of the complaint that the

fraud charged upon the agent is in reference to the assurances and representations made by him at the time of the delivery of the policy. Allegations eight and nine of the complaint on that point have been quoted in this opinion, and sections six and seven of the complaint specifically refer to the fraudulent representations alleged to have been made by the agent as confined to the delivery of the policy. Nowhere in the complaint is it alleged that the agent practiced any fraud upon the plaintiff in the procuring of his signature to the application. The allegation of the fraud practiced upon the plaintiff by the agent, which we have already called attention to, was that the agent "represented to the plaintiff and assured him that the policy so presented was such a policy as the plaintiff had, in his former conversation, stated that he (plaintiff) would accept, and that the said policy so, presented by Jones provided for the rate of a level rate premium, to-wit, $22.40 per quarter, and that the insurance provided in said policy would be extended during the life of the plaintiff upon the payment of a regular premium of $22.40 per quarter." The evidence did not measure up to the allegation. The plaintiff testified that when the agent delivered the policy to him, he said "here is your policy," or "this is your policy," and nothing more. It was not contested that the policy was strictly in accordance with the application; that the application was not for a level rate policy, but called for one upon the annual renewal term plan, with surplus applied to keeping premiums level; that attached to and forming a part of the policy was a schedule of rates showing exact premiums to be paid with advancing age, and also providing that the surplus was to be applied to keeping premiums level, and that the defendant issued the policy and sent it to Jones to be delivered by him to the plaintiff. The plaintiff testified that he neither read the application at the time he signed it, nor did he read the

policy and copy of the application attached thereto until about nine years after the issuance of the policy, although it was in his possession all that time; and that no one attempted to prevent him from reading the policy or application, and he could have read and understood the contract as to increasing premiums if he had examined it. Witness further stated that he knew nothing about the insurance business and relied entirely upon the agent in the matter; that he had great faith in him. He was asked on cross-examination: "The clause in that policy about the several premiums for each successive year or each year that you should live is perfectly plain, is it not?" His answer was: "Yes, I suppose it is plain enough, if I had not had the confidence that blinded me." And further, he was asked: "There is a schedule of rates in the policy setting forth the amount for each year; if you had read that policy you could have understood it, could you not?" He answered, "Yes." There is no evidence whatever in the case that the plaintiff asked a single question of the agent about the policy at the time of its delivery, nor did the agent express any opinion or make any assurance or representation about it. In my opinion the plaintiff should have read the policy under the circumstances of its delivery. The agent Jones was the agent of the defendant and did not occupy any relation of trust or confidence as to the plaintiff. They were engaged in a business transaction in which the plaintiff was acting for himself and the agent for the defendant. It appears from all the evidence that the plaintiff had ample opportunity to read the policy before he paid the first premium, for he gave his note for that premium payable more than a month after the policy was delivered; and there is no evidence that the defendant at any time afterwards did anything to induce him not to read it; and if he did not read it he can blame himself alone. There is not a particle of evidence of fraud at

the time of the delivery of the policy or afterwards, and the contention of the plaintiff that his implicit and blind confidence in the agent warranted him in trusting that the policy was what he had verbally and previously contracted for, is met by the safe and general rule that where there is no fraud, parol negotiations leading up to a written contract are merged in the subsequent written contract—such written contract being presumed to embrace the *whole*, the final agreement of the parties and to embody their intentions. When, therefore, one of the parties to an agreement delivers to the other a contract in writing, and that other party when he receives the paper understands that it is handed to him as a contract between them, then the one accepting the document and keeping it assents to its terms, conditions and stipulations as they are therein expressed, although he does not read it and even be ignorant of the contents. This view of the law is well expressed in the case of this same defendant against Mowatt, 32 Canada Supreme Court Report, 147, in a quotation from *Parker v. Railroad,* 2 C. P. D., 416. It was there said that when the company handeth the respondent the policy, the law said for them: "Read, examine, be careful, for never mind what we or you may have said previously, we accept your application to insure you, but we cannot give you any other policy but this one, and in that document alone is contained the contract between us; pay the first premium only if you are satisfied with it; if you accept it without reading it, you will not be allowed to contend hereafter that it does not correctly express the contract between us; whatever is not found therein will be understood to have been reciprocally waived and abandoned." The contract was formed between the plaintiff only when the policy was delivered. All that had gone before was only preliminary. In *Upton v. Tribilcock,* 91 U. S., 45, it was said: "That the defendant did not read the charter and by-

laws, if such were the fact, was his own fault. It will not do for a man to enter into a contract, and, when called upon to respond to its obligations, to say that he did not read it when the signed it. If this were permitted, contracts would not be worth the paper on which they are written. But such is not the law. A contractor must stand by the words of his contract, and if he will not read what he signs he alone is responsible for his omission." *In re Greenfield Estate,* 14 Pa. St., 489, *Gibson, C. J.,* for the Court, said: "If a party who can read will not read a deed put before him for execution, he is guilty of supine negligence which, I take it, is not the subject for protection either in equity or in law." In *Dellinger v. Gillespie,* 118 N. C., 737, the plaintiff handed the defendant a written contract, making no attempt to conceal any of its provisions and practiced no trick to induce him to execute it. This Court there said: "It is plain that no deceit was practiced here. It was pure negligence in the defendant not to have read the contract. There it was before him, and there was no trick or device resorted to by the plaintiff to keep him from reading it." The defendant's negligence was held inexcusable, and the Court said that the introduction of parol evidence in the Court below to show that there was a verbal contract before the execution of the written one was erroneous, and that it was nothing but an attempt to contradict the written instrument executed by the defendant concerning the same matter. The same principle was held in *Benedict v. Jones,* 129 N. C., 470, where a married woman undertook to avoid the legal sufficiency of the probate of a deed executed by herself and her husband because she did not read it and was ignorant of its contents. The Court said there that "it makes no difference that she said she did not know what the paper contained, that she did not understand its contents, and if she had she would not have signed it. She could read and write.

134——36

The paper was before her and she was under no coercion."
The same view is also expressed in *Dorset v. Mfg. Co.,* 131
N. C., 254: "And that where a party can read and has the op-
portunity and does not do so, no other circumstances occur-
ring or connected therewith, the party signing cannot have
the instrument set aside upon the ground that he was deceived
as to its contents." In *Leigh v. Brown* (Georgia), 25 S. E.
Rep., 621, it was held that it was the duty of the insured
when he found that his policy differed in a material respect
from the kind of policy for which he had contracted, if he did
not desire to retain and accept the policy received by him, to
return or offer to return the same within a reasonable time to
the company. The case of *Bostwick v. M. Life Ins. Co.*
(Wis.), 92 N. W. Rep., 246, is a most interesting case and
the main facts very much like the one before us. The defend-
ant there induced the plaintiff to sign an application for a
policy of life insurance by representing to him that he called
for one that would be fully paid in ten annual payments of a
specified amount. He signed and gave to the agent the appli-
cation, relying on the truth of such representations. During
the negotiations between the plaintiff and the agent of the
company, with the result above stated, the agent urged the
plaintiff to take out what was called a five per cent. debent-
ure policy, while the plaintiff all the time insisted that he
wanted and would purchase only a contract that would be
fully performed on his part by ten annual payments. In
good time a policy was sent to the plaintiff by mail, ostensi-
bly responsive to his application, accompanied by a letter
from the agent to the effect that it was a five per cent. debent-
ure policy issued pursuant to the application. The plaintiff
put the policy away among his papers without reading it,
relying upon its being what the agent assured him the appli-
cation called for. He paid the first premium, but upon ex-
amining the policy, about four and one-half months after

it was delivered to him, he discovered that it was an annual life policy requiring him to pay the premiums each year during his life. The same plaintiff bought a policy from one Parker and one from A. H. Barrington issued by the same company in which the insured claimed that he had contracted with the agent for a different policy from the ones they received. However, when the policies were delivered to them, there was no assurance that the policy was in accordance with the understanding between them, but simply a letter advising enclosure of policies. The Court held that the plaintiff could not recover on the assigned policies, for the reason that there was no evidence of any assurance on the part of the agent, at the time of the delivery of the policies to the parties, that the policies were in accordance with the agreement. But because the plaintiff Bostwick was assured by the letter from the agent accompanying the delivery of the policy that the policy was in accordance with the agreement, the Court held that his claim on his own policy should be submitted to the jury to say whether under all the circumstances the letter of the agent prevented him from examining the policy at the time of the delivery. In the case before us there were no representations made by the agent when the policy was delivered and no questions asked by the plaintiff. The agent simply said: "Here is your policy," or "this is your policy," which was just the same thing as if it had been enclosed with a letter.

In the much-litigated case of *McMaster v. N. Y. Life Ins. Co.,* first reported in 99 Fed. Rep., 856, the fact was that the agent of an insurance company had told the insured, when the application for the policy was made, that the policy itself would give him thirteen months' insurance upon the payment of the first annual premium, but the policy when afterwards issued by the company did not contain that provision. Upon an action to reform the policy so as to make it conform to

the agreement with the agent, it was proved that the insured had accepted it without reading it. The Court there said: "Customary negotiations for insurance do not constitute a contract where there is no intention to contract otherwise than by a policy made and delivered upon payment of the first premium. * * * It was his duty to read and know the contents of the policies when he accepted them. It is true that the evidence is that he did not read them. But the legal effect of his acceptance is the same as if he had read them. He had the opportunity to read and to learn their contents, and if he did not it was his own gross negligence and no act of the insurance company or of its agent that concealed them and misled him as o their effect. The statement of the agent fourteen days before the deceased received the policies that they would insure him for thirteen months from the payment of the first premium was not a statement of an existing fact. It was not calculated to impose upon him or to prevent him from reading his policies and learning for himself whether this promise had been kept or broken. It was not a fraudulent representation, because fraud never can be predicated of a promise or a prophecy. Neither the company nor its agent therefore made any representation or promise, or used any artifice or deceit to prevent the insured from learning the terms of his policies. Their contents were not concealed. They were not misrepresented. The deceased must accordingly be conclusively presumed to have known their terms when he accepted them. If one can read his contract, his failure to do so is such gross negligence that it conclusively estops him from denying knowledge of its contents, unless he was dissuaded from reading it by some trick, artifice or fraud of the other party to the agreement." That case was afterwards reviewed by the Supreme Court of the United States (183 U. S., 25), and the result of that decision was that the plaintiffs were allowed to re-

cover. The principle of law, however, announced by the Circuit Court, which we have quoted, was not overruled. The Supreme Court of Canada in Mowatt's case, *supra,* referred to the case of *McMaster v. N. Y. Life, supra,* as it was reported both in the Federal Reporter and in the United States Reports, and in reference to the effect of the opinion of the Supreme Court upon that of the Circuit Court, his Honor who wrote the opinion of the Court said: "Since the argument I have noticed that the United States Supreme Court has reversed the decision of McMaster's case. But the Court exclusively based its conclusions first upon the fact that the agent of the company had inserted material words in the application, after it had been signed, without the applicant's knowledge; secondly, upon the fact that the agent of the company, when delivering the policy, had deliberately put the insured off his guard and induced him not to read it, by the express assertion in answer to the insured that the policy was in the terms agreed upon. Had it not been for these two facts, to which sufficient weight had not been given in the lower courts, their judgment against the plaintiff's contentions, as I read *Chief Justice Fuller's* opinion, would have been sustained by the Supreme Court."

In Bostwick's case the Supreme Court of Wisconsin took the same view of the effect of the decision of the Supreme Court in McMaster's case. That Court referring to that matter said: "Returning to McMaster's case, we will say and endeavor to demonstrate that counsel is in error in his view that the Supreme Court, in reversing the decision of the Court of Appeals, 99 Fed. Rep., 856, held that possession of a policy of insurance does not impute knowledge of its contents, in the absence of any deception practiced upon the possessor subsequent to his making the application therefor, reasonably calculated to deter him from examining such policy at the time of its receipt. The Court, as it seems to us,

held directly to the contrary." These analyses, in our judgment, are correct expositions of the decisions of the two Courts, the United States Supreme Court and the Circuit Court of Appeals. From the opinion of the Supreme Court of the United States we will make the following quotations in verification of these analyses: "But the company says that McMaster requested that the policy should go into effect on December 12, 1893, and that his representative is estopped from denying that that is the operation of the policies as framed and accepted, or that the second premiums matured December 12, 1894. It was found from the evidence that after McMaster had signed the applications, and without his knowledge or consent, the agent of the company inserted therein, 'Please date policy same as application,' and it was further found that the policies were returned to Sioux City and were taken by the company's agent to McMaster, he 'asking agent if the policies were as represented and if they would insure him for the period of thirteen months, to which the agent replied that they did so insure him,' and thereupon McMaster paid the agent the full annual premium, or the sum of $21 on each policy, and without reading the policies he received them and placed them away." We think the evidence of this unauthorized insertion and of what passed between the agent and McMaster when the policies were delivered, taken together, was admissible on the question whether McMaster was bound by the provision that subsequent payments should be made on December 12th, commencing with December 12, 1894, because requested by him, or because of negligence on his part in not reading the policies.

So, we see that the decision of the Supreme Court of the United States, in its reversal of the judgment of the Circuit Court of Appeals, did so solely on the ground that the assurance and representations made by the agent to McMaster when he delivered the policies, rendered the question, whether

keeping them as he did without reading them and rejecting them constituted an acceptance in satisfaction of what was bargained for, one of fact for the jury. The general principles of law decided in both Courts were, as we have set them forth in this opinion, approved; but in the Supreme Court it was held that the false representations, made at the time of the delivery of the policies, had a tendency to throw McMaster off his guard, and that the Court below ought not to have held as a matter of law that he was inexcusably negligent. In my opinion, the Court below ought to have granted the motion made by the defendant for a judgment of nonsuit against the plaintiff.

WALKER, J., concurs in the dissenting opinion.